IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NEHEMIYAH THURMAN, )
)
        Plaintiff, )
)
 v. ) No. 06 C 7194
)
THE VILLAGE OF HAZEL CREST, )
DARRYL NORMAN, BRIAN BRUCATO, and )
TONYA SMITH-DOUMAS, )
)
        Defendants. )

**MEMORANDUM OPINION AND ORDER**

Defendants Officer Brian Brucato ("Brucato"), Officer Darryl Norman ("Norman"), Officer Tonya Smith-Doumas ("Smith-Doumas") (collectively, "Officers"), and the Village of Hazel Crest ("Village") seek summary judgment on counts I through V of plaintiff Nehemiyah Thurman's ("Thurman") second amended complaint ("complaint"). The complaint alleges: 1) assault and battery against Norman and Brucato; 2) excessive force under 42 U.S.C. § 1983 against Norman and Brucato;[1] 3) conspiracy under § 1983 against Norman, Brucato, and Smith-Doumas; 4) false arrest under § 1983 against Norman, Brucato, and Smith-Doumas; 5) failure to intervene under § 1983 against Norman, Brucato, and Smith-Doumas; and 6) respondeat superior against the Village.[2] For the following

---

[1]Counts I and II were previously dismissed with respect to Smith-Doumas.

[2]With regard to count VI, defendants note that, in the absence of a *Monell* claim, they assume that Thurman meant to include the Village as an indemnitor against any compensatory damage award

reasons, the motion is granted in part.

I.

The facts in this case are mostly disputed. The parties agree that, on September 17, 2006 around 3:00 or 4:00 a.m., Thurman was driving a white 2003 Chevy Suburban. Thurman is an African-American man. At the time of the incident, he was forty-four years old and was wearing a sleeveless t-shirt and shorts. He was pulled over by what appeared to be a police vehicle behind him with red and blue lights. A Caucasian man and an African-American man emerged from an unmarked van, and a female officer emerged from the vehicle with the red and blue lights. The parties agree that Brucato is Caucasian and Norman is African-American. Thurman described the Caucasian man as "[e]ither Hispanic or European looking," "either of Italian descent or Hispanic," with "[d]ark hair" and "[m]aybe a moustache," "[k]ind of heavyset, not very tall," "[a]pproximately 5'7, 5'8," and "[m]aybe [in his] late 20s, 30s." Thurman described the African-American man as "[a]bout six feet, 6-foot one," "[m]aybe 230 or 240 pounds," with a "mustache," and Thurman was "not sure" of this man's age - "[l]ate 30s, 40s."

In response to complaints from business owners, the Hazel Crest Police Department assigned an overtime shift to the Grenoble and Fountainblue Plazas in Hazel Crest, Illinois to keep an eye on the businesses for break-ins. Norman was assigned to that detail,

---

pursuant to 745 ILL. COMP. STAT. 10/9-102.

and requested that Brucato be assigned as his partner for the midnight shift on September 17, 2006. Norman and Brucato drove a maroon minivan. Smith-Doumas testified that, on September 17, 2006, she was a patrol officer working the midnight shift. She also testified that Officer Watson ("Watson") was "the officer in charge that day."

Between 1:00 and 2:00 a.m., Norman and Brucato observed a white Suburban drive through the parking lot where they were parked. At approximately 3:00 a.m., the parties agree that Norman and Brucato observed an attempted burglary by four or five male African-American teenagers, who were on foot, wearing all black, and had on hoods. Brucato contacted other units in the area by radio about these subjects. Smith-Doumas responded to the call and, when she arrived at the business, the subjects saw her and fled in different directions. Norman and Brucato chased one of them to a used car lot near a wooded area.

While Norman and Brucato were standing in the used car lot, they observed a white Suburban that Brucato testified "looked the same" as the one observed earlier. In support of their motion, defendants argue that Norman and Brucato saw Thurman's vehicle twice during their stake-out, but the record does not show that Thurman's vehicle was necessarily the same one seen earlier that morning. Additionally, while defendants argue that no nearby businesses were open at the times when they saw a white Suburban,

3

Smith-Doumas testified that gas stations in the area stay open past midnight. Thurman testified that he left his house "around 3:50 a.m." to buy aspirin. He attempted to go to a Shell station located at "183rd and Kedzie," but was unable to enter because the attendant had locked the door. He then tried to go to a Walgreens in the "Cherry Creek of Cherry Hill Mall," but did not enter the parking lot because he realized that the store was closed. He then planned to go to a twenty-four hour Citgo station located at "175th and Kedzie," but he never made it there.

Norman and Brucato testified that the white Suburban they observed from the used car lot looked "suspicious." Norman and Brucato testified that its lights were not on, although Thurman testified that his headlights were on both while he was driving and when he stopped. Norman and Brucato got back into the van and followed the white Suburban. One of them advised other units by radio that they were "following a suspicious with possible relations to this incident." Smith-Doumas received a radio call from one of the officers that there was a "white SUV driving back and forth behind the businesses . . . with his headlights off." Smith-Doumas then got a transmission from one of the officers requesting that she "put a stop on the vehicle" because she was driving a marked vehicle.

4

Thurman testified that the only other traffic at around "4:00, 4:10" was a "[d]ark green" van.[3] He testified that the van made a u-turn behind him, traveled behind him, and extinguished its headlights several times. Thurman testified that eventually he got to "a dead end or a 'T' intersection," at which point he did not see the van, and he turned his vehicle around to travel back up the street heading northbound. Brucato testified that the white Suburban made a u-turn and started driving toward the van with its lights off, and Norman swerved to avoid a head-on collision. But Thurman testified that he was driving northbound and the van was heading southbound, the van drove towards him, made "a maneuver or a turn to the left coming across the portion of where [Thurman was] traveling in the lane or portion of the street [Thurman was] traveling in" to block him from proceeding forward, and Thurman "proceeded north, and [he] move[d] around this van." Defendants denied Thurman's statement that he maneuvered around the van to avoid a collision only "insofar that this is an inaccurate citation" to Thurman's deposition transcript, despite the foregoing testimony on other pages of the transcript.

---

[3]Thurman's testimony regarding the color of the van is inconsistent with the other deponents' testimony, but the parties do not dispute that Thurman was testifying about the van driven by Norman and Brucato.

Smith-Doumas got behind Thurman's vehicle, activated her emergency lights, and conducted a traffic stop.[4] Thurman testified that he was not angry. Brucato testified that the driver opened his door forcefully. And Smith-Doumas testified that Thurman "flung" open the door to his vehicle, jumped out, and started walking toward her squad car in a combative manner "with his fists balled." Norman testified that Brucato jumped out of the van "in full uniform announcing, Hazel Crest police." Norman further testified that Brucato told Thurman to stay in the car - but he would not stay in the car - and to take his hands out of his pockets and get on the ground. Thurman testified that he never had his hands in his pockets. Thurman also testified that the Caucasian and African-American men were not wearing uniforms. Smith-Doumas likewise testified that Norman and Brucato were dressed in "plainclothes" and were in an unmarked vehicle; she also testified that "their badges were clearly hanging around their neck." Norman testified that he was dressed in plainclothes with his badge hanging around his neck, and Brucato was dressed in "full

---

[4]Smith-Doumas testified that she activated her lights and sirens, but did not make an announcement on the PA system; nevertheless, defendants admitted that Smith-Doumas ordered Thurman over a "P.A. system" to get out of his vehicle, and he immediately complied. Norman testified that "[n]o siren was activated" and "[n]o PA system was used." Brucato likewise testified that she activated her emergency lights, but she did not make an announcement over her PA system.

6

uniform." Brucato testified that he was dressed in "patrol clothes," which he described as including his uniform.

Thurman testified that he turned on the "dome light" inside his vehicle and exited with his "left hand and arm through the door, not on the inside, on the outside" because he "wanted them to see [his] hands." He said he was a former police officer. Thurman testified that he did not kick open his door. Thurman also testified that he did not go anywhere when he got out of his vehicle; he began to step out of his vehicle, stayed between the door and "the door weld," and exited the vehicle "standing up." Thurman further testified that the "Caucasian" man came around the front of the van with a "gun drawn." Thurman heard "'Get down, nigger, get down,'" twice in different voices. Thurman testified that he did not get down on the ground when he heard that because he did not know who the people were; he saw the Caucasian exit the van and he believed the African-American had been in the van.

Smith-Doumas testified that she opened her vehicle and asked Thurman to stop, but he kept coming toward her. She also testified that Norman and Brucato told Thurman to get down on the ground, but he did not comply and still came toward her. Norman testified that Thurman "started walking face to face with the officer and the officer was walking back while he was walking towards him." Brucato testified that Smith-Doumas was "[i]nside her vehicle" and Brucato was in front of Smith-Doumas' car, and Thurman walked

7

toward him.  Brucato further testified that he reholstered his gun as Thurman got closer.

Norman and Brucato testified that Thurman was walking toward Brucato, and Norman used a "distraction blow" to contain Thurman. Norman testified that he "made up [his] mind to stop a threat before it happened" and "threw a distraction blow to stop Mr. Thurman before he was able to cause any bodily harm to [his] partner."  Thurman testified that, when he began to bend down with his hands up, he believes the "African-American person" hit him "in the face" with a "metal flashlight."  Norman and Brucato testified that Norman used his left forearm to strike Thurman on his right shoulder and chest area.  Norman denied taking out his flashlight or striking Thurman in the face with anything.  Brucato likewise denied that Norman struck Thurman in the face with a flashlight. Defendants denied facts cited by Thurman that purport to relate to Norman's physical description as well as his alleged striking of Thurman with a flashlight on the grounds that Thurman testified about an African-American person as opposed to naming Norman. Defendants do not, however, dispute that Norman was involved in the incident.  Smith-Doumas testified that Norman and Brucato were on the driver's side of Thurman's vehicle and she was on the passenger's side visually inspecting it.  She testified that she has no idea what Norman and Brucato were doing because she could

8

not see anything, although she heard them and she did not hear any physical altercation.

Thurman testified that the "African-American person" forced him to the ground, and he felt a knee in his back and/or "the upper portion of [his] neck." Defendants denied only that a knee was placed in Thurman's neck, without any citation to the record. Thurman testified that while lying "facedown" on the ground, he saw a "female officer" exit the emergency vehicle. Although Thurman admitted in response to defendants' statement of facts that Brucato handcuffed him, he also asserted in his statement of additional facts that both Norman and Brucato handcuffed him based on Brucato's testimony. Thurman also testified, however, that the Italian-looking officer did not have any contact with him. The parties disagree as to whether Thurman resisted being handcuffed. Thurman testified that he did not resist the handcuffing, while Brucato testified that there was "just a brief struggle" but Thurman did not resist in any other way after he was handcuffed. Thurman testified that "the African-American officer called [him] a nigger several times again, said that we finally stopped your black ass and said that let's see what kinds of drugs you got here in this car." Again, defendants denied this fact on the grounds that plaintiff's deposition testimony does not refer to Norman.

Thurman was handcuffed from behind for twenty to twenty-five minutes while laying and sitting on the ground. Thurman testified

9

that the African-American and the Italian searched his vehicle. His wallet was removed from his pocket. His name was cleared of records, warrants, and moving violations. He remained handcuffed until "an older African American officer" arrived at the scene. Watson arrived on the scene while Thurman was handcuffed. Norman testified that he and Brucato told Watson that Thurman could be arrested for assault for running Norman's and Brucato's van off the road. Norman testified that Watson decided not to charge Thurman and he was released.

## II.

Summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56©. A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant initially bears the burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading," but rather "must set forth specific

facts showing that there is a genuine issue for trial." *See* FED. R. CIV. P. 56(e). I must construe all facts in the light most favorable to the non-movant and draw all justifiable inferences in favor of that party. *See Anderson*, 477 U.S. at 255.

III.

The Officers argue that summary judgment should be granted on count IV because (1) plaintiff was temporarily detained but not arrested; (2) articulable suspicion existed to make a *Terry* stop because the Officers observed Thurman's white vehicle twice in the area they were staking out for possible criminal activity at a time when no businesses were open; and (3) probable cause existed to make a traffic stop and full arrest because Thurman drove his vehicle directly at Norman's and Brucato's vehicle. With regard to the second argument, the record does not show that Thurman's vehicle was the one seen earlier that morning, and, according to Smith-Doumas' testimony, gas stations in the area would have been open at the times when a white Suburban was observed. With regard to the third argument, the parties dispute whether Thurman drove his vehicle at Norman's and Brucato's vehicle. Thurman contends that the Officers' show of authority and use of force prevented him from leaving the scene such that an arrest occurred, for which probable cause did not exist.

The Officers rely on the Seventh Circuit's recent opinion in *Jewett v. Anders* in arguing that the detention of Thurman was

11

within the bounds of an investigatory stop as opposed to a full arrest. In *Jewett*, the Seventh Circuit explained that "an investigatory stop can involve a measured use of force." 521 F.3d 818, 824 (7th Cir. 2008). But the "use of force may escalate to the point where the encounter becomes, as a matter of law, a formal arrest." *Id.* (citation omitted). To differentiate between an investigatory stop and an arrest, the question is whether the actions were reasonable in light of the circumstances. *Id.* (citation omitted). In evaluating whether the force used for the investigatory stop was "so disproportionate" to its purpose so as to convert it into an arrest, I consider "whether the surrounding circumstances g[a]ve rise to a justifiable fear for personal safety on the part of the officer" as well as the plaintiff's "own actions in resisting an officer's efforts." *Id.* at 824-25 (quotations omitted). Here, I cannot determine whether an arrest occurred based on the force employed because I cannot assess the reasonableness of the force where the parties dispute the nature of the force used as well as the surrounding circumstances. Therefore, summary judgment on count IV on the grounds that there was merely an investigatory stop, as opposed to an arrest, is denied.

The Officers' argument that, as a matter of law, probable cause existed to arrest Thurman also fails. Probable cause is an absolute defense to a § 1983 wrongful arrest claim. *Chelios v.*

12

*Heavener*, 520 F.3d 678, 685-86 (7th Cir. 2008). Probable cause exists "if, at the time of the arrest, the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* at 686 (citations omitted). Defendants maintain that the Officers had probable cause to arrest Thurman because he drove his vehicle directly at Norman's and Brucato's van. Thurman's testimony, however, is that Norman's and Brucato's van drove toward him and he maneuvered around it. A jury must determine whether probable cause existed where the facts alleged to provide probable cause or the reasonable inferences to be drawn therefrom are in dispute. *See id.*

The Officers further argue that they are entitled to qualified immunity as to count IV, even assuming an arrest was made, because there is no evidence suggesting a constitutional violation. "The doctrine of qualified immunity shields from liability public officials who perform discretionary duties. *Jewett*, 521 F.3d at 822 (citation omitted). Police officers "who act in ways they reasonably believe to be lawful" are shielded. *Id.* (quotation omitted). The test for qualified immunity is whether: (1) "the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right;" and (2) the "constitutional right was clearly established at the time of the

13

alleged violation." *Id.* at 822-23 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).[5] When the affirmative defense of qualified immunity is raised, it becomes plaintiff's burden to defeat it. *Id.* at 823. Plaintiff may meet his burden by showing that a clearly analogous case established the right to be free from the specific conduct at issue or that the conduct is so egregious that no reasonable person could have believed it would not violate a clearly established right. *Chelios*, 520 F.3d at 691 (citations omitted).

The Officers contend that there was no constitutional violation because they saw Thurman's vehicle twice at the location of a failed burglary, made a traffic stop, temporarily detained him, and then allowed him to leave without being arrested. The Officers further assert that the unlawfulness of a stop and temporary detention is not apparent. Thus, the Officers reiterate the argument that they made an investigatory stop based on articulable suspicion. They do not contend that the constitutional requirement of probable cause to arrest was not clearly established at the time of the incident. As set forth above, taking the facts in the light most favorable to Thurman, there remains a question of

---

[5]The Seventh Circuit recently noted that the "rigid" order of the *Saucier* test has been repeatedly criticized, and the Supreme Court has granted certiorari to consider whether the case should be overruled. *Phelan v. Vill. of Lyons*, --- F.3d ---, No. 07-2224, 2008 WL 2550738, at *2 (7th Cir. Jun. 27, 2008). Meanwhile, *Saucier's* sequential approach remains in effect. *Id.*

14

fact as to whether an arrest was made and, if so, whether probable cause existed. Therefore, summary judgment on count IV based on qualified immunity is denied.

Norman and Brucato also claim that they are entitled to qualified immunity as to count II because there was no constitutional violation where the force used was objectively reasonable. Specifically, they argue that Brucato did not use any force and that Norman justifiably administered only a distraction blow. In considering whether Norman and Brucato violated Thurman's constitutional right, I analyze whether excessive force was used based on an "objective reasonableness" standard. *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003) (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). The use of force is unconstitutional if, "judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Id.* (quotation omitted). It is clear that police officers cannot "shove, push, or otherwise assault innocent citizens without any provocation whatsoever." *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996); *Chelios*, 520 F.3d at 691-92. Even if there are not many closely analogous cases, Thurman may show that the force used was so plainly excessive that a reasonable officer would have been on notice that it violated the Fourth Amendment. *Chelios*, 520 F.3d at 692.

15

Establishing that the force was "so plainly excessive" requires factual development. *Id.*

Here, the circumstances surrounding the use of force as well as the nature of the force employed are disputed. The parties have presented conflicting accounts of the events preceding the stop of Thurman's vehicle as well as Thurman's, Norman's, and Brucato's behavior following the stop. With respect to Thurman, the parties dispute how he exited his vehicle and what he did after doing so. With respect to Brucato, although defendants argue that he did not use any force against Thurman based on Thurman's testimony that the Italian-looking officer did not have any contact with him, Brucato testified that both he and Norman handcuffed Thurman. And Thurman testified that he felt a knee in his back and neck while being handcuffed. With respect to Norman, while Norman and Brucato maintain Norman used a distraction blow to contain Thurman, Thurman claims that, after he began to get down, the African-American officer struck him in the face with a metal flashlight. Taking the facts in the light most favorable to Thurman, there remains a question of fact as to whether the force used was objectively reasonable. *See id.* Summary judgment on count II based on qualified immunity is denied.

Norman and Brucato move for summary judgment on count I based on the Illinois Tort Immunity Act ("Act"), 745 Ill. Comp. Stat. 10/2-

16

202.⁶ The Act provides that public employees are not liable for acts or omissions in "the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." § 10/2-202. Again, the facts regarding the force used against Thurman and the surrounding circumstances are disputed such that I cannot determine on this motion whether the conduct was willful and wanton. Therefore, summary judgment on count I is denied.

The Officers seek summary judgment on count III, arguing that there is no evidence of any sort of agreement to deprive plaintiff of his constitutional rights. To establish a prima facie case of civil conspiracy, a plaintiff must show (1) an express or implied agreement among defendants to deprive the plaintiff of his constitutional rights, and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement. *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988); *Moore v. Morales*, 445 F. Supp. 2d 1000, 1012 (N.D. Ill. 2006) (Castillo, J.). To sustain a claim that defendants conspired to deny plaintiff's constitutional rights, plaintiff must allege that defendants "directed themselves toward an unconstitutional action by virtue of a mutual understanding[,]" and support such allegations with facts

---

⁶I do not consider the request, raised for the first time in the reply brief (without citation to any authority), that this count be dismissed as duplicative of the federal excessive force claim because it could lead to double recovery and confuse the jury.

17

suggesting a "'meeting of the minds.'" *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000). A conspiracy claim cannot survive summary judgment based on vague conclusory allegations that include no overt acts reasonably related to promoting the conspiracy. *Id.* Here, although Thurman argues that defendants had an agreement to falsely arrest him and to use excessive force against him, he concedes that he has no direct proof of any such agreement. And he points to no overt acts by the Officers related to promoting the conspiracy. Rather, Thurman argues that it can be "inferred" that the Officers had and executed a plan based on their "ongoing and frequent communication" as well Norman's and Brucato's relationship as partners and their request that Smith-Doumas stop Thurman's vehicle. With regard to the Officer's communications, Thurman's citation to the record merely indicates that radio transmissions were made to other units that Norman and Brucato were "following a suspicious with possible relations to this incident" and to Smith-Doumas "to put a stop on the vehicle." Plaintiff has not adduced specific facts sufficient to withstand summary judgment on count III.

The Officers request summary judgment on count V, reiterating the arguments for summary judgment on the false arrest and excessive force counts. Specifically, the Officers argue: (1) with regard to the false arrest claim, there was no arrest or, if there was, it was justified; and (2) with regard to the excessive force

18

claim, there was only the distraction blow administered by Norman and no other prolonged contact. They argue that "it is difficult to reconcile how any of the Defendant-officers could have prevented any force from being used." An officer who is present and fails to intervene to prevent other officers from infringing on a citizen's constitutional rights is liable under § 1983 if that officer had reason to know that: (1) excessive force was being used, (2) an unjustifiable arrest was made, or (3) any constitutional violation was committed; and that officer "had a realistic opportunity to intervene to prevent the harm from occurring." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). For the reasons set forth above with respect to the false arrest and excessive force claims, count V likewise involves disputed issues of fact that preclude summary judgment.

IV.

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. Accordingly, summary judgment is granted as to count III and denied as to the remaining counts.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: August 6, 2008